# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JOHN F. PRATT,                          :
     Plaintiff,                     :
                              :
v.                                      :        CIVIL ACTION NO.
                              :        3:10-cv-413 (CFD)
MICHAEL J. ASTRUE,                      :
COMMISSIONER,                           :
SOCIAL SECURITY ADMINISTRATION,         :
     Defendant.                     :

## RULING ON SOCIAL SECURITY APPEAL

The plaintiff, John F. Pratt, filed this action seeking review of the final decision of the defendant, Michael J. Astrue, Commissioner of the Social Security Administration ("Commissioner"), denying his applications for a period of disability, disability insurance benefits, and supplemental security income. The plaintiff has filed a motion to reverse the Commissioner's decision [Dkt. #12], and the Commissioner has filed a motion to affirm [Dkt. #15]. For the reasons given below, the Commissioner's decision is affirmed as to the disability insurance claim and reversed as to the supplemental security income claim.

## I.	Administrative Proceedings

The plaintiff alleged that he became disabled on August 1, 2001, at age 47. [Tr. 109, 116] After his applications were denied, he requested a hearing before an Administrative Law Judge ("ALJ"). [Tr. 52-53] ALJ Ronald J. Thomas held a hearing, which consisted of testimony by the plaintiff, on September 16, 2009. [Tr. 17-36] The ALJ then issued his decision on November 3, 2009, finding that the plaintiff was not disabled. [Tr. 4-16]

The ALJ applies a five-step sequential evaluation process to applications for a period of disability, disability insurance benefits, and supplemental security income. First, the ALJ determines whether the claimant is performing substantial gainful work activity. 20 C.F.R. §§ 404.1520(a)(4)(i) & 416.920(a)(4)(i). If the claimant is not performing such activity, the ALJ proceeds to the second step to determine whether the claimant has a severe medically determinable physical or mental impairment or combination of impairments. §§ 404.1520(a)(4)(ii) & 416.920(a)(4)(ii). The impairment must be expected to result in death or must last or be expected to last for a continuous period of at least twelve months. §§ 404.1509 & 416.909. If the claimant has a severe impairment, the ALJ proceeds to the third step to determine whether the impairment meets or equals an impairment listed in appendix 1 of the applicable regulations. §§ 404.1520(a)(4)(iii) & 416.920(a)(4)(iii). If the claimant's impairment meets or equals a listed impairment, the claimant is disabled.

If the claimant does not have a listed impairment, the ALJ proceeds to the fourth step to determine whether the claimant has the residual functional capacity ("RFC") to perform his past relevant work. §§ 404.1520(a)(4)(iv) & 416.920(a)(4)(iv). RFC is defined as the most that a claimant can do despite the physical and mental limitations that affect what he can do in a work setting. §§ 404.1545(a)(1) & 416.945(a)(1). If the claimant's RFC indicates that he cannot perform his past relevant work, the ALJ proceeds to the fifth step to determine whether the claimant can perform any other work available in the national economy in light of his RFC, age, education, and work experience. §§ 404.1520(a)(4)(v) & 416.920(a)(4)(v). The claimant is entitled to a period of disability, disability insurance benefits, and supplemental security income if he

is unable to perform other such work.  The claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden of proof as to the fifth step. Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008).

In the present case, the ALJ determined that the plaintiff was not performing substantial gainful activity and had the severe impairments of "chronic lumbar radiculopathy, degenerative disc disease of the lumbar spine and chronic pain syndrome."  [Tr. 10]  The ALJ then determined that the plaintiff did not have an impairment or combination of impairments that met or medically equaled any of the listed impairments.  [Tr. 10]  The ALJ found that the plaintiff had the RFC "to perform light work . . . however, he is limited to occasional bending, stooping, twisting, squatting, kneeling, balancing, crawling and climbing with the exception of no ladders, ropes or scaffolds."  [Tr. 11-15]  The ALJ determined that the plaintiff could not perform his past relevant work as a tire changer and truck driver but could perform other jobs that exist in significant numbers in the national economy.  [Tr. 15-16]  The ALJ accordingly concluded that the plaintiff was not disabled.  [Tr. 16]

The Commissioner's Decision Review Board selected the plaintiff's claim for review but then notified him on February 26, 2010 that it had failed to complete its review of the ALJ's decision within the required ninety days.  [Tr. 1-3]  The ALJ's decision thus became final, and the plaintiff then filed the present case.

II.    **Standard of Review**

Following the denial of a disability insurance claim, "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or

without remanding the cause for a rehearing.  The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."  42 U.S.C. § 405(g).  See also id. § 1383(c)(3) (prescribing same judicial review for denials of supplemental security income claims).

"A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error. . . .  Substantial evidence means more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008).  "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence."  Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (citing Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982)).

**III.    Discussion**

In the present case, the plaintiff argues that the ALJ improperly (1) considered the medical opinions, (2) assessed his credibility, and (3) failed to analyze his combination of impairments.

A.    The ALJ's Evaluation of the Medical Opinions

The plaintiff first challenges the ALJ's evaluation of the medical evidence, arguing that the ALJ failed to follow the "treating physician rule."  That rule generally directs the ALJ to "give more weight to opinions from [the plaintiff's] treating sources . . . .  If [the ALJ] find[s] that a treating source's opinion . . . is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the

-4-

other substantial evidence in [the] case record, [the ALJ] will give it controlling weight. When [the ALJ does] not give the treating source's opinion controlling weight, [the ALJ considers several] factors . . . in determining the weight to give the opinion." 20 C.F.R. §§ 404.1527(d)(2) & 416.927(d)(2). Those factors are (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) whether the opinion is supported by relevant evidence such as medical signs and laboratory findings, (4) whether the opinion is consistent with the entire record, (5) whether the treating source is a specialist in the relevant area, and (6) any other factors that support or contradict the opinion. §§ 404.1527(d)(2)(i) through (d)(6) & 416.927(d)(2)(i) through (d)(6).

In examining the medical evidence, which spans nine years from 2001 through 2009, the Court recognizes a distinction between the plaintiff's applications. In order to qualify for a period of disability and disability insurance benefits, the plaintiff was required to be disabled as of December 31, 2006, when his insured status expired. § 404.131. In order to qualify for supplemental security income, the plaintiff was required to be disabled at some point during the pendency of his application, from its filing on March 20, 2008 through the date of the ALJ's decision on November 3, 2009. §§ 416.330 & 416.335. With those time requirements in mind, the Court turns to the plaintiff's arguments concerning his treating physicians.

1.    Evidence Relating to the Application for Disability Insurance Benefits

The plaintiff contends that the ALJ improperly evaluated reports by three treating physicians. First, the plaintiff's treating neurologist, Dr. Michael Opalak, prepared a report on July 27, 2004. [Tr. 337-40] Dr. Opalak explained that the plaintiff injured his

back while "attempting to realign wheels on a truck. He was lying on his back and pushing the vehicle up — using his feet — and started to experience lower back pain." [Tr. 337] Dr. Opalak noted that a magnetic resonance imaging (MRI) scan of the plaintiff's back showed a "disc extrusion" and that the plaintiff's treatment was "conservative," consisting of pain medication, muscle relaxants, physical therapy, and epidural steroid injections. [Tr. 337] Dr. Opalak indicated that surgery was considered, but he rejected that option due to the absence of "strong evidence" that it was required. [Tr. 338, 340] Dr. Opalak found that the plaintiff's spine was minimally tender, there were varied sensory levels across his back, he was markedly limited in his ability to bend forward, his gait was "very stiff," and he had a positive straight leg raise test, indicating that his lower back pain was caused by a herniated disc. [Tr. 339] In Dr. Opalak's view, the plaintiff was "certainly going to require future treatment" including physical therapy, functional rehabilitation, and probably pain management. [Tr. 339] Dr. Opalak concluded: "It is difficult to envision [the plaintiff] having any work capacity currently. Should his pain be brought under better control and his obvious loss of acclimation to effort be resolved, he may be released to work — but with restrictions of no lifting/carrying over 40 pounds — [in other words,] a sedentary position." [Tr. 340]

Dr. David Kramer, an orthopedist, treated the plaintiff from September 20, 2001 to August 12, 2004. [Tr. 205-13] Upon discharge, Dr. Kramer diagnosed the plaintiff with "[m]ultilevel lumbar disc degeneration without evidence of neural compression or spinal deformity." [Tr. 205] Dr. Kramer explained that "the previously identified extruded disc material . . . decreased in size" and was "barely perceptible." [Tr. 205] Dr. Kramer concluded his treatment note as follows: "[The plaintiff] still has no work

capacity given his level of neck and low back discomfort."  [Tr. 205]  Dr. Kramer referred

the plaintiff to Dr. David Kloth for pain management.

On August 31, 2004, Dr. Kloth reviewed an MRI scan of the plaintiff's lumbar

spine, finding "small herniation," "mild degeneration" of a disc, insignificant "central

canal narrowing," "a broad based [disc] bulge . . . although no clear root compression,"

"mild degeneration and bulging" of another disc, and moderate spinal joint

degeneration.  [Tr. 556]  Dr. Kloth stated that "these findings are not clearly significant

enough to explain [the plaintiff's] symptoms."  [Tr. 555]  Dr. Kloth observed that the

plaintiff "move[d] around the room in a guarded fashion" and had "difficulty getting on

and off the examining table."  [Tr. 556]  Dr. Kloth found "marked bilateral paravertebral

tenderness" in the plaintiff's back, and the plaintiff reported "increased pain with

[lumbar] flexion and extension" and "bilateral bending."  [Tr. 556-57]

In a subsequent treatment note dated May 10, 2005, Dr. Kloth summarized the

results of a test regarding the plaintiff's back pain.  [Tr. 546-47]  The findings were

"unremarkable" and "less than impressive" and "would not warrant open surgical

intervention."  [Tr. 546-47]  On January 31, 2006, Dr. Kloth reported that the plaintiff

was taking pain medication and receiving physical therapy but continued to complain of

pain.  [Tr. 537]  Dr. Kloth recommended an epidural steroid injection, but he also noted

that the plaintiff had "light duty work capacity" and should "start job searches."  [Tr. 537]

Dr. Kloth advised "a maximum lifting of 20 pounds and avoid[ance of] repetitive

bending, crawling, and twisting.  [The plaintiff] is rapidly approaching maximal medical

improvement."  [Tr. 537]  Nearly one year later, on January 2, 2007, Dr. Kloth again

explained that the plaintiff was able to work:  "We have released him to light duty work

as of last winter and he has been doing job searches since I believe last January or February." [Tr. 342]

On October 9, 2007, Dr. Kloth prepared another update on the plaintiff's condition. [Tr. 353] Dr. Kloth indicated that a test for lower back pain was negative, the plaintiff's "MRI does not reveal any specific findings that would explain his symptoms, he certainly does not appear to be a surgical candidate, he has failed to respond to . . . conservative modalities of treatment [such as epidural steroid injections], and at this juncture I believe he has reached maximal medical improvement as we have nothing left to offer this gentleman." [Tr. 353] Dr. Kloth continued the plaintiff's pain medication and continued to follow up on his condition. On February 24, 2009, Dr. Kloth reiterated that the plaintiff had reached maximal medical improvement, noting that his work capacity "has not changed in the last several years." [Tr. 462]

The last document submitted by Dr. Kloth was a physical RFC questionnaire dated September 11, 2009. [Tr. 558-61] Dr. Kloth gave the plaintiff a prognosis of "chronic condition with periodic exacerbations," noting that his lumbar and leg pain increased as his activity level increased. [Tr. 558] Dr. Kloth indicated that the plaintiff was not a malingerer and that depression and anxiety affected his physical condition. [Tr. 559] Dr. Kloth opined that the plaintiff's pain occasionally interfered with the attention and concentration needed to perform even simple work tasks on a daily basis. [Tr. 559] When asked whether the plaintiff could tolerate work stress, Dr. Kloth wrote "[E]motional stress?" next to the question and then checked a box indicating that the plaintiff could perform low stress jobs. [Tr. 559] Dr. Kloth then reported that the plaintiff could walk less than one city block without rest or severe pain. [Tr. 559] Dr. Kloth

stated that the plaintiff could sit for twenty minutes before needing to stand, and he could stand for ten minutes before needing to sit.  [Tr. 559]  In an eight-hour workday with normal breaks, Dr. Kloth judged the plaintiff to be able to sit for a total of two hours and to stand or walk for a total of two hours.  [Tr. 560]  Dr. Kloth reported that the plaintiff needed to walk for five minutes once every twenty minutes, to shift positions at will, to use a cane, and to take unscheduled breaks for ten to fifteen minutes "probably daily."  [Tr. 560]  Turning to the plaintiff's other abilities, Dr. Kloth indicated that the plaintiff could rarely lift and carry less than ten pounds; rarely twist, stoop, or bend; occasionally climb stairs; and never climb ladders, crouch, or squat.  [Tr. 560-61]  The plaintiff was likely to have "good days" and "bad days" and to be absent from work about four days per month due to his impairments or treatment.  [Tr. 561]  When asked for "the earliest date that the description of symptoms and limitations in this questionnaire applies," Dr. Kloth responded:  "At least back to August 2001."  [Tr. 561]

The ALJ considered the reports of Dr. Opalak, Dr. Kramer, and Dr. Kloth, among others, and gave "controlling weight" to "the treating and examining physicians' statements that are supported by the clinical findings . . . ."  [Tr. 15]  The ALJ specifically assigned "minimal weight" to Dr. Kloth's physical RFC questionnaire on the ground that it was inconsistent with "the overall medical record including clinical findings . . . ."  [Tr. 13-14]  The ALJ relied heavily on the plaintiff's MRI scans showing mild and moderate problems and the plaintiff's prescribed conservative treatment rather than surgery.  [Tr. 11-15]

The plaintiff contends that the ALJ improperly considered the reports of Dr. Opalak, Dr. Kramer, and Dr. Kloth by ignoring the portions that were favorable to his

claim of disability and instead focusing only on the portions that were unfavorable. The plaintiff points to the ALJ's failure to provide complete consideration of the following statement by Dr. Opalak on July 27, 2004: "It is difficult to envision [the plaintiff] having any work capacity currently. Should his pain be brought under better control and his obvious loss of acclimation to effort be resolved, he may be released to work — but with restrictions of no lifting/carrying over 40 pounds — [in other words,] a sedentary position." [Tr. 340] Dr. Kramer made the following similar statement on August 12, 2004: "[The plaintiff] still has no work capacity given his level of neck and low back discomfort." [Tr. 205] Dr. Kloth ultimately opined in his physical RFC questionnaire on September 11, 2009 that the plaintiff's symptoms and limitations, which significantly affected his ability to lift, carry, walk, sit, stand, and generally move his body, existed "[a]t least back to August 2001." [Tr. 561]

Although Dr. Opalak, Dr. Kramer, and Dr. Kloth made some statements that were favorable to the plaintiff's claim of disability, the ALJ determined that they did not outweigh the evidence that was unfavorable to the plaintiff. The Court recognizes that the record contains some conflicting and confusing evidence, and it is the ALJ's duty to sort through it and to support his decision adequately. As to the plaintiff's application for disability insurance benefits, the Court concludes that the ALJ properly fulfilled his duty for the following reasons.

There is an unclear basis for the July and August 2004 statements of Dr. Opalak and Dr. Kramer that the plaintiff was unable to work. Dr. Opalak and Dr. Kramer appeared to agree with Dr. Kloth in August 2004 that the objective medical evidence was not particularly severe. Dr. Kramer characterized the plaintiff's disc extrusion as

"barely perceptible," and Dr. Kloth reported that the MRI "findings are not clearly significant enough to explain [the plaintiff's] symptoms."  [Tr. 205, 555]  Dr. Opalak stated that if the plaintiff received better pain management, he could perform sedentary work and lift or carry up to 40 pounds.  [Tr. 340]  However, "[s]edentary work involves lifting no more than 10 pounds at a time"; 20 C.F.R. § 404.1567(a); "[l]ight work involves lifting no more than 20 pounds at a time"; id. § 404.1567(b);  and "[m]edium work involves lifting no more than 50 pounds at a time"; id. § 404.1567(c).  Dr. Opalak's opinion regarding the plaintiff's abilities is therefore unclear; he may have referred to the wrong number of pounds or the wrong level of exertion.  Dr. Kramer's statement that "[the plaintiff] still has no work capacity given his level of neck and low back discomfort" suggests that it may have been based on the plaintiff's subjective complaints of "discomfort" rather than Dr. Kramer's objective finding that the disc extrusion was "barely perceptible."  [Tr. 205]

The basis for Dr. Kloth's physical RFC questionnaire is also unclear, as there are stark differences between the questionnaire and all of Dr. Kloth's other records.  Dr. Kloth indicated in the questionnaire on September 11, 2009 that the plaintiff's pain significantly limited his physical abilities since "[a]t least back to August 2001," when he injured his back.  [Tr. 561]  However, Dr. Kloth began treating the plaintiff on August 31, 2004, approximately three years after the injury.  At that time, Dr. Kloth stated that the medical evidence was "not clearly significant enough to explain [the plaintiff's] symptoms."  [Tr. 555]  On May 10, 2005, Dr. Kloth reported that a test regarding the plaintiff's back pain yielded "unremarkable" and "less than impressive" findings that "would not warrant open surgical intervention."  [Tr. 546-47]  On January 31, 2006, Dr.

Kloth stated that the plaintiff had "light duty work capacity" and should "start job searches." [Tr. 537] Dr. Kloth repeated his assessment of the plaintiff's work capacity on January 2, 2007 and February 24, 2009. [Tr. 342, 462] On September 11, 2009, however, Dr. Kloth indicated in the questionnaire that the plaintiff could rarely lift and carry less than 10 pounds. [Tr. 560] As explained above, light work involves lifting up to 20 pounds. 20 C.F.R. § 404.1567(b). Dr. Kloth did not explain why he abruptly changed his previously repeated opinion that the plaintiff could perform light work or why his new opinion applied retroactively to the entire time period since the plaintiff's injury in August 2001. In light of the inconsistency between the questionnaire and all of Dr. Kloth's other records, the ALJ properly gave the questionnaire "minimal weight" when considering the plaintiff's application for disability insurance benefits. [Tr. 13-14] In order to succeed in that application, the plaintiff was required to be disabled as of December 31, 2006, when his insured status expired. Dr. Kloth's attempt to apply his new opinion on September 11, 2009 back to the relevant time period was unavailing and thus correctly accorded little weight by the ALJ.

The record contains further evidence supporting the ALJ's decision that the plaintiff did not qualify for disability insurance benefits. First, Dr. Jarob Mushaweh conducted an independent medical examination of the plaintiff on September 2, 2003. [Tr. 192-95] Dr. Mushaweh's impression was that the plaintiff's "symptoms [were] simply too diffuse to be solely explainable on the basis of the small herniation [in his back]. His treatment, in my opinion, ought to be conservative. . . . [T]he small herniation simply cannot explain [his] clinical presentation and need not be addressed surgically." [Tr. 194] Dr. Mushaweh's opinion was similar to Dr. Kloth's later

assessment on August 31, 2004 that there was an inconsistency between the medical evidence and the plaintiff's symptoms. [Tr. 555] Dr. Mushaweh also noted that the plaintiff initially had not complied with his prescribed regimen of physical therapy, an observation that the ALJ properly noted as reflecting unfavorably on the plaintiff's claim of disability. [Tr. 14, 192]

Next, Dr. Robert Ferraro conducted an independent medical examination of the plaintiff on December 11, 2003. [Tr. 323-31] Dr. Ferraro observed that the plaintiff "elicit[ed] no complaint of pain" "while disrobing from street clothing to his shorts," but Dr. Ferraro noted that the plaintiff "move[d] very deliberately during that process." [Tr. 326] The plaintiff had a negative bilateral straight leg raise test, which is used to determine whether lower back pain is caused by a herniated disc. [Tr. 327] Dr. Ferraro explained that the plaintiff had "diagnostic imaging studies to document widespread degenerative disc disease in the lumbar spine . . . . In my opinion these lesions, either singularly or jointly in no way would explain the multiplicity of complaints and the distribution of pain claimed by [the plaintiff]." [Tr. 329] Dr. Ferraro also found "at least" five Waddell signs, which are used to determine whether a person actually suffers from lower back pain. [Tr. 329] Dr. Ferraro indicated that the presence of three or more of the signs suggests that the person is "demonstrating an inappropriate illness behavior pattern." [Tr. 329] Dr. Ferraro's examination therefore contained significant information that was unfavorable to the plaintiff's claim of disability — the lack of pain while undressing, the negative straight leg raise test, the inconsistency between the medical evidence and the symptoms, and the five Waddell signs.

Finally, Dr. Joseph Connolly completed a physical RFC assessment of the plaintiff with respect to his disability insurance claim at the Commissioner's request on August 6, 2008. [Tr. 442-49] Dr. Connolly determined that the plaintiff could occasionally lift and carry up to 20 pounds and frequently lift and carry up to 10 pounds. [Tr. 443] Dr. Connolly judged the plaintiff to be able to sit, stand, or walk for about six hours in an eight-hour workday. [Tr. 443] According to Dr. Connolly, the plaintiff had unlimited ability to push and pull and could occasionally balance, stoop, kneel, crouch, crawl, and climb a ramp or stairs, but he could never climb ladders, ropes, or scaffolds. [Tr. 443-44] He had no manipulative, visual, communicative, or environmental limitations except for the need to avoid concentrated exposure to hazards such as machinery and heights. [Tr. 445-46] Dr. Connolly's assessment thus supported the ALJ's finding that the plaintiff could perform light work.

The Court concludes that the ALJ properly considered the medical records and determined that the plaintiff failed to qualify for a period of disability and disability insurance benefits because he was not disabled as of December 31, 2006. There was ample evidence from multiple physicians supporting the ALJ's decision. Although the plaintiff focused on a small number of statements by his treating physicians that appeared to be favorable to his claim of disability, those statements were unclear or inconsistent with the majority of the evidence. The ALJ properly gave those statements little weight and cited adequate evidence to support his decision denying the plaintiff's disability insurance claim.

2.    Evidence Relating to the Application for Supplemental Security Income

The plaintiff next argues that the ALJ improperly considered the functional

capacity examination conducted by Robb Wright, an occupational therapist, on May 20, 2008. [Tr. 407-22] Wright found that the plaintiff could occasionally lift and carry less than five pounds; had marginal ability to squat, reach, and bend; and could sit for about ten minutes and stand or walk for about twenty minutes. [Tr. 408] Wright observed that the plaintiff "did not present with overt signs of maladaptive pain behavior nor evidence of effort to meaningfully under-demonstrate his actual ability level. [He] did present with what was considered to be 'learned' limitation, but this was supported with concurrent evidence of objective pain challenges. . . . [His] pain paradigm . . . is noted to present with 'learned' behavior, but [he] was quite able to adapt and utilize the offered paradigm and modify his pain report and level accordingly. No overt signs of pain or symptom magnification were noted [during the examination]." [Tr. 409] The plaintiff demonstrated only one Waddell sign, "suggesting that no obvious evidence of nonorganic signs [is] being demonstrated." [Tr. 414]

Wright concluded that the plaintiff was limited to performing sedentary work and would need to alternate from sitting to standing to walking. [Tr. 409-10] Additionally, "[p]rovisions such as a rolling cart could further enhance the [plaintiff's] options." [Tr. 410] Wright opined that the plaintiff might be able to increase his functionality if he addressed his cardiovascular problems. [Tr. 410] However, Wright found a "general incongruence" between the plaintiff's "demonstrated limited ability" and "his ability to live alone and care for himself and his abode." [Tr. 418] Wright explained that his findings were "relatively reliable" and that "under the most optimal conditions, a slightly greater degree of ability would be expected . . . ." [Tr. 408] Furthermore, "relatively reliable" findings "may reflect a situation where symptom magnification is not present but

submaximal effort secondary to anxiety or fear is presenting as a limiting factor."  [Tr. 422]

The ALJ assigned "minimal weight" to Wright's evaluation on the ground that it was inconsistent with the other medical evidence.  [Tr. 13-14]  The plaintiff challenges the ALJ's consideration of Wright's evaluation, and the Commissioner does not advance an argument in opposition.  The Court agrees with the plaintiff that the ALJ's analysis of Wright's evaluation was deficient.  The ALJ failed to distinguish between the time periods relevant to the plaintiff's applications for disability insurance benefits and supplemental security income.  Most of the medical evidence related to the former, while Wright's evaluation related to the latter.  The plaintiff's lack of disability during the time he was eligible for disability insurance benefits did not preclude the possibility that he was disabled during the time he was eligible for supplemental security income beginning on March 20, 2008.  Two months after the plaintiff applied for supplemental security income, Wright found objective evidence of pain and no sign that the plaintiff was attempting to deceive, although Wright noted an incongruity between the plaintiff's limitations and his professed ability to live independently.  [Tr. 409-10, 414]  The plaintiff demonstrated some learned behavior, perhaps attributable to anxiety or fear, but Wright's findings were nevertheless "relatively reliable."  [Tr. 422]  It was improper for the ALJ to weigh Wright's evaluation on the basis of its inconsistency with other medical evidence that was not contemporaneous.  The ALJ should have focused instead on the evidence from the relevant time period beginning on March 20, 2008.  The case therefore must be remanded to allow the ALJ to weigh Wright's evaluation in the context of the plaintiff's application for supplemental security income rather than his

application for disability insurance benefits.  The Court notes that the ALJ is not bound to weigh Wright's evaluation more heavily on remand but instead to weigh it in light of all the evidence relevant to the plaintiff's application for supplemental security income.

The Court also notes that Dr. Kloth's records, particularly the questionnaire dated September 11, 2009, are relevant to the plaintiff's application for supplemental security income and must be reexamined on remand.  The ALJ properly gave little weight to the questionnaire in the context of the plaintiff's application for disability insurance benefits because it was inconsistent with Dr. Kloth's other records and there was no explanation for Dr. Kloth's attempt to apply it retroactively to the time period relevant to the disability insurance claim.  However, the questionnaire could be deserving of greater weight in evaluating the plaintiff's supplemental security income claim, especially because of its similarities to Wright's report.

Not all of the relevant evidence is favorable to the plaintiff's supplemental security income claim.  For example, the record contains a physical RFC assessment completed by Dr. Carol Honeychurch at the Commissioner's request on April 16, 2008. [Tr. 197-204]  Dr. Honeychurch determined that the plaintiff could occasionally lift and carry up to 20 pounds and frequently lift and carry up to 10 pounds.  [Tr. 198]  Dr. Honeychurch found that the plaintiff could sit, stand, or walk for about six hours in an eight-hour workday; had unlimited ability to push and pull; could occasionally balance, stoop, kneel, crouch, crawl, and climb a ramp or stairs; could never climb ladders, ropes, or scaffolds; and had no manipulative, visual, communicative, or environmental limitations.  [Tr. 198-201]

Approximately one month after Dr. Honeychurch completed her assessment, Wright examined the plaintiff and reached different conclusions. More than one year later, Dr. Kloth changed his previously repeated opinion. On remand, the ALJ must consider conflicting evidence such as these reports and give reasons for the manner in which he decides to weigh them. The plaintiff has successfully argued that the ALJ must reexamine whether he was disabled at some point during the pendency of his application for supplemental security income.

      B.     <u>The ALJ's Assessment of the Plaintiff's Credibility</u>

The plaintiff next argues that the ALJ improperly assessed his credibility. The ALJ is entrusted with the assessment of a witness's credibility because the ALJ has the opportunity to observe the demeanor of the witness. <u>Carroll v. Sec'y of Health & Human Servs.</u>, 705 F.2d 638, 642 (2d Cir. 1983). As to the credibility of the claimant's complaints of symptoms, the ALJ first determines whether the claimant suffers from an underlying medical impairment that could reasonably be expected to cause the alleged symptoms. 20 C.F.R. § 416.929(b). If so, the ALJ considers the objective medical evidence and other evidence of symptoms, including (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of medication taken to alleviate the symptoms; (5) treatment to relieve the symptoms, other than medication; (6) any measures the claimant has used to relieve the symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions relating to the symptoms. §§ 416.929(c)(2) through (c)(3).

The ALJ must evaluate the claimant's statements about the intensity, persistence, and limiting effects of his symptoms in light of the objective medical evidence and any other evidence. § 416.929(c)(4). The ALJ must consider whether there are any inconsistencies within the claimant's statements or conflicts between the claimant's statements and the evidence. § 416.929(c)(4). When the claimant's statements are internally consistent and consistent with the evidence, there is a strong indication that the claimant is credible. Social Security Ruling (SSR) 96-7p, 1996 WL 374186, at *5-*6. The ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Id. at *4.

In determining whether the ALJ properly assessed the plaintiff's credibility in the present case, the Court first summarizes the plaintiff's testimony at the ALJ hearing. The plaintiff testified that he had a high school education and lived alone. [Tr. 22] He stated that he had constant back pain "[a]ll day and all night." [Tr. 25, 30] He described it as "a sharp . . . stabbing pain right into . . . the spine" that radiated to his legs and feet, causing a tingling sensation. [Tr. 30] The plaintiff testified that the pain interfered with his sleep: "I can go to sleep for a little while, but . . . the pain just gets to the point that it wakes me up. I have to get up, try to find a different position, and I'll go to either the couch or the chair, [a] recliner, and then try to get some more sleep." [Tr. 31]

As to the plaintiff's physical abilities, he testified that he could walk "probably about maybe twenty-five steps or so, and then I have to stop and relax my feet for a

while." [Tr. 32] He needed to alternate between sitting and standing every fifteen to twenty minutes and had difficulty bending, squatting, climbing, and twisting. [Tr. 32] He testified that when he tries to bend down,"the pain just starts to shoot right up through my back," and that bending caused him to injure his knee. [Tr. 32] The plaintiff stated that he had been using a cane for seven years. [Tr. 32] As to his upper-body strength, he testified: "I know that I can't lift anything." [Tr. 24] However, he later estimated that he could lift eight to ten pounds. [Tr. 25] He took pain medication once per day and experienced some side effects: "I do have a tendency to have some dizziness, and . . . a lot of times I forget a lot of stuff." [Tr. 25, 33] The plaintiff stated that his physical abilities were markedly different before his injury: "I used to be . . . pretty physical. I did a lot of exercising, running, walking," and one-arm push-ups. [Tr. 30]

As to the plaintiff's daily activities, he testified: "[W]hen I get up in the morning I'll try to make a pot of coffee and . . . I'll try to go and do . . . the usual morning routine as far as bathing. I usually take a shower. Shaving I have trouble with a lot of times. Sometimes I'll skip [it] because my back is hurting so bad that I can't get my arms up there. Getting in and out of the shower, I have to use the wall and . . . the doors and the handles just to be able to get in and out of the tub." [Tr. 26-27] The plaintiff stated that he could drive, but when the ALJ asked him whether he drove frequently, the plaintiff responded: "Not all the time. . . . I do go to my [Alcoholics Anonymous] meetings." [Tr. 27-28] He then testified that his socializing was limited: "I'll go to see my friend who drove me [to the ALJ hearing]; because I can't go a long distance, I'll go see him. I'll go see my sister or my brother." [Tr. 28] The plaintiff stated that he did not have any "lady friends," did not babysit his grandchild, and did not travel or go bowling,

fishing, or hunting. [Tr. 28] However, he testified: "I do watch TV. I do try to go out for an occasional walk around the mobile park that I live in." [Tr. 28] The plaintiff stated that before he suffered his injury he enjoyed country line dancing and volunteering at a fire department. [Tr. 30]

The plaintiff also addressed household chores: "As far as yard work, I can't do anything. I have to hire a kid that lives in the neighborhood." [Tr. 27] As to chores inside the house, the plaintiff testified: "I usually do all . . . my cooking and cleaning, but it does take a long period of time for me to be able to clean the house, or it takes me twice as long to cook." [Tr. 31] The plaintiff then stated that he does not perform all the chores in one day. [Tr. 31] He receives some assistance with grocery shopping: "I'll do the shopping, but I do have a friend that comes with me, or a family member that will come and drive with me, get things that I can't pick up . . . or reach." [Tr. 31-32]

The ALJ found that the plaintiff was "partially credible," but "the objective evidence [did] not demonstrate the existence of limitations of such severity as to have precluded the [plaintiff] from performing all work on a regular and continuing basis at any time from the alleged onset date of disability." [Tr. 11, 14-15] The ALJ determined that the plaintiff's testimony and the medical evidence showed that he was "capable of performing most activities of daily living" and "able to prepare his own meals and perform personal as well as household tasks." [Tr. 13, 14]

With respect to the plaintiff's disability insurance claim, the Court concludes that the ALJ's credibility analysis is supported by the record. The ALJ identified two strong reasons to find that the plaintiff's complaints of constant pain were not fully credible. First, the plaintiff testified that he could live alone, cook, clean, take an occasional walk

around his mobile home park, drive, go grocery shopping, and visit relatives and a friend.  Second, the plaintiff's complaints of pain were inconsistent with the medical findings through December 31, 2006.

With respect to the plaintiff's supplemental security income claim, the Court concludes that the ALJ must perform a new credibility analysis after reconsidering Wright's evaluation and reexamining the other relevant evidence.  The ALJ's credibility discussion contained a further sign of deficient consideration of Wright's evaluation.  The ALJ stated that the plaintiff "told [Wright] that he spent his day walking around his mobile park home . . . ."  [Tr. 13]  However, Wright actually wrote that the plaintiff "reports effort to walk around his mobile home park.  He reports that he gets tired and needs to sit frequently.  The balance of the [plaintiff's] day is reported to be relatively sedentary . . . ."  [Tr. 411]  There is a significant difference between "[spending one's] day walking around" and "report[ing] effort to walk around."  The ALJ's incorrect citation of Wright in that instance is an additional indication that the ALJ improperly considered the evaluation.  On remand, the ALJ must reassess the plaintiff's credibility as it pertains to the supplemental security income claim.

C.      The Plaintiff's Combination of Impairments

The plaintiff's next argument is that the ALJ failed to analyze his combination of impairments.  The plaintiff contends that the ALJ should have considered whether his back pain was exacerbated by his other impairments of left knee pain, umbilical hernia, and depression, all of which arose only during the pendency of his application for supplemental security income.  The ALJ found that those impairments were not severe, and the plaintiff does not challenge that finding.  [Tr. 10]  Although the ALJ explained

-22-

that the plaintiff's combination of impairments did not meet or equal a listed impairment, the ALJ did not explicitly address the combination in his discussion of the plaintiff's RFC. "[T]he combined effect of a claimant's impairments must be considered in determining disability; the [Commissioner] must evaluate their combined impact on a claimant's ability to work, regardless of whether every impairment is severe." Burgin v. Astrue, 348 Fed. Appx. 646, 647 (2d Cir. 2009). In reexamining the plaintiff's supplemental security income claim on remand, the ALJ must specifically consider the combined effect of all of the plaintiff's impairments on his ability to work.

D.    Whether the Case Should Be Remanded to a Different ALJ

The plaintiff requests that the case be remanded to a different ALJ, but he makes no argument in support of his request. "The decision to remand a Social Security case to a different ALJ is generally reserved for the Commissioner. . . . Courts may interfere with the Commissioner's decision only upon a showing of bias or partiality on the part of the original ALJ. . . . There is a rebuttable presumption that the original ALJ is unbiased. . . . The plaintiff, as the party asserting the ALJ's bias, bears the burden of rebutting that presumption by demonstrating a conflict of interest or some other specific reason for disqualification. . . . To prove bias, the plaintiff must show that the ALJ's behavior, in the context of the whole case, was so extreme as to display clear inability to render fair judgment. . . . [A]ny alleged prejudice on the part of the decisionmaker must be evidence from the record and cannot be based on speculation or inference." Card v. Astrue, Docket No. 3:09-cv-1102 (CFD) (TPS), 2010 WL 4643767, at *1 (D. Conn. Nov. 9, 2010). "Factors for consideration . . . include: (1) a clear indication that the ALJ will not apply the appropriate legal standard on remand; (2)

-23-

a clearly manifested bias or inappropriate hostility toward any party; (3) a clearly apparent refusal to consider portions of the testimony or evidence favorable to a party, due to apparent hostility to that party; (4) a refusal to weigh or consider evidence with impartiality, due to apparent hostility to any party." Id. at *2.  In the present case, the plaintiff failed to make an argument as to why the case should be remanded to a different ALJ.  The plaintiff therefore did not meet his burden of demonstrating that the ALJ would be unable to consider the case impartially.

## IV.  CONCLUSION

The plaintiff's motion to reverse and to remand [Dkt. #12] is GRANTED as to the supplemental security income claim and DENIED as to the disability insurance claim. The Commissioner's motion to affirm [Dkt. #15] is DENIED as to the supplemental security income claim and GRANTED as to the disability insurance claim.  The case is remanded for further proceedings on only the supplemental security income claim.  The Clerk is directed to close this case.

**SO ORDERED.**

Dated this 28th day of January, 2011, at Hartford, Connecticut.

/s/Christopher F. Droney
CHRISTOPHER F. DRONEY
UNITED STATES DISTRICT JUDGE